**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------X

JANE DOE 1,

                                        **Plaintiff,**

              -against-

**MCADAM FINANCIAL GROUP LLC, et al.,**

                                        **Defendants.**

---------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __  8/3/2022
```

**22-CV-00113 (GHW)(SN)**

**REPORT &
RECOMMENDATION**

**SARAH NETBURN, United States Magistrate Judge.**

**TO THE HONORABLE GREGORY H. WOODS:**

       Jane Doe 1 ("Doe") sued McAdam Financial Group LLC ("McAdam Financial") and its

former employee Charles Norfleet ("Norfleet") after Norfleet raped her the night after a

company-sponsored outing at local bars in Boston, Massachusetts. Both Defendants move to

dismiss Doe's complaint for lack of personal jurisdiction, improper venue, and failure to state a

claim. Alternatively, Defendants move that the case be transferred to the District of

Massachusetts. I recommend that the Court transfer the case to the District of Massachusetts. If

the Court disagrees with my conclusion, I request that this matter be remanded to me for further

consideration of Defendants' other arguments.

## BACKGROUND

       McAdam Financial is a financial advisory firm with offices in four states that serves over

5,000 clients and has over $829 million of assets under management. ECF No. 6 (Compl.) ¶¶ 24-

25. Doe, who resides in New York, started work at McAdam Financial as a financial advisor in

June 2020 after graduating college. Id. ¶¶ 21, 34. Norfleet, a Lead Senior Manager, worked in a

supervisory position above employees like Doe and ran regular meetings for entry-level financial advisors at McAdam Financial. Id. ¶ 37. Doe interacted with him on a weekly basis, especially in connection with the meetings that he ran. Id. She also worked with Norfleet in other contexts; among other things, he helped Doe learn sales techniques and attract clients. Id. ¶¶ 37, 56. Norfleet worked from McAdam Financial's Boston office at all times during his employment, along with District Manager Aaron Swenson (to whom Doe reported), Senior Manager Ian Helmus, and District Manager Davis Wilson. Id. ¶¶ 36, 38-39.

Because Doe started work at McAdam Financial during the COVID-19 pandemic, she worked remotely at first, but she got to know her coworkers over video and group calls. Id. ¶ 40. She learned from other female employees in the McAdam Financial Boston office who had worked with Norfleet in person that he had a reputation for inappropriate behavior towards women. Id. ¶¶ 40-42. He made sexualized comments to subordinate female employees, inappropriately grabbed and physically touched female employees while out at events, and groped a female coworker. Id. ¶¶ 42, 44. Nothing was done to remediate his conduct. Id. ¶ 47. Other male managers also engaged in inappropriate conduct: Norfleet, Swenson, Helmus, and Wilson had a group chat in which they often discussed and bantered about the appearances of their female coworkers. Id. ¶¶ 48-49. All of the managers at McAdam Financial who trained entry-level advisors like Doe were men. Id. ¶ 54. At the Boston office, some male managers frequently discussed their female coworkers' appearances. Id. Doe also noticed that most successful managers at the company were men, but did not raise the issue of gender disparity among managers because doing so would make professional advancement more difficult. Id. ¶¶ 54-55. Doe describes other sexualized behavior towards women at McAdam Financial; management was aware but took no remedial action. Id. ¶¶ 49-51, 58-61.

On June 25, 2021, Doe traveled from New York to Boston to visit the McAdam Financial office and meet some of her coworkers in person for the first time. Id. ¶¶ 63-64. That day, McAdam Financial hosted an after-work social event at a bar in Boston called Flight Club because the company had achieved some internal goals. Id. ¶ 64. Specifically, Swenson (Doe's direct manager) organized the outing to celebrate receiving a company bonus based on the numbers achieved by junior employees, including Doe. Id. He said that he would use some of the bonus money to pay for everyone's drinks. Id.

At around 4:00 p.m. that day, about 18 McAdam Financial employees—including Doe—went to Flight Club. Id. ¶ 65. As the night progressed, Norfleet gave her multiple drinks. Id. ¶ 66. The group of employees eventually left Flight Club and went to another bar called Publico. Id. ¶ 67. Once there, Doe felt dramatically more intoxicated, to the point where she believes that she may have been drugged or supplied and urged to consume so much alcohol by Norfleet that she entered into a "blackout" state. Id. Doe's coworkers later informed her that, while the group was at Publico, they saw Norfleet making out with her at the bar while she was in an obviously intoxicated state, although she was unable to understand or appreciate what was happening and has no memory of doing so. Id. ¶¶ 68-69. Multiple McAdam Financial employees, some of whom had supervisory authority over Doe, personally observed Norfleet making out with her, then leaving the bar with her, and did not intervene. Id. ¶¶ 70-71. At least four current employees who saw her leave with him have since expressed their regret to Doe for not stepping in. Id. ¶ 72.

The next morning, Doe woke up naked in an unfamiliar bed. Id. ¶ 73. It was clear to her that Norfleet had raped her while she was either unconscious or unable to consent. Id. While she was trying to figure out where she was, Norfleet climbed on top of Doe and again raped her. Id. ¶ 75. Paralyzed by fear and helplessness, Doe was frozen and unable to respond; Norfleet stayed

completely silent during the rape. Id. ¶¶ 76-77. After the assault, Doe got up but could not find her clothes. Id. ¶ 78. Norfleet knew where they were and retrieved them. Id.

When Doe left to go to her sister's apartment, she began to fear for her employment status at McAdam Financial because Norfleet was her supervisor and could impact her ability to make money in her commission-based role. Id. ¶¶ 80-81. To protect herself and gauge Norfleet's disposition, Doe engaged in casual text conversation with him so that he would not take any negative employment action against her. Id. ¶ 84.

That day, June 26, 2021, Doe took a train back to New York. Id. ¶ 82. Once she arrived, she took Plan B, a form of emergency contraception. Id. ¶ 83.

Three days later, on June 29, 2021, she disclosed the sexual assault to Swenson, her direct supervisor, who told her that he could not handle the report and that she would need to speak to a vice president. Id. ¶¶ 85-86. Doe then related the events again to Vice President Joseph MacDonald. Id. ¶ 88. It was apparent to her during that second conversation that others had told MacDonald she had "gone home with" Norfleet. Id. MacDonald then told Doe that, whenever she was ready, she could discuss the assault with Jack McAdam, Chief Operating Officer and brother of McAdam Financial's founder. Id. ¶¶ 90-91.

Also on June 29, 2021, Doe participated in a video call with several female coworkers who expressed their regret about what had happened. Id. ¶ 94. Two women told her that Norfleet had touched them inappropriately the night she was assaulted. Id. Doe also learned that until about a month before the assault, Norfleet was in a committed relationship but regularly made comments about how annoying his girlfriend was. Id. ¶ 95. On one occasion, he said to another female employee at McAdam Financial ("Doe 2") that he had always been interested in her. Id. About two weeks before he raped Doe, Norfleet and Doe 2 had been among a number of

McAdam Financial employees who participated in a company-sponsored kickball game, then went out to a bar. Id. ¶ 96. At the bar, Norfleet touched Doe 2 in a way that made her uncomfortable, grabbing her waist and touching her back. Id. Supervisory employees saw Norfleet touching Doe 2 and another female employee in this manner. Id. ¶¶ 96-98. That night, Doe 2 had an experience almost identical to Doe's: she did not remember part of the night or going home with Norfleet, but recalled waking up naked in an unfamiliar bed and Norfleet climbing on top of her and raping her again once she had woken up. Id. ¶ 100. It is unclear whether other employees at McAdam Financial knew about Norfleet's assault of Doe 2 before this call. Id. ¶ 102.

Multiple supervisory employees at McAdam Financial were generally aware of Norfleet's conduct towards female employees, but the company failed to take any remedial action or conduct any investigation into his behavior before June 25, 2021, that might have prevented his rape of Doe. Id. ¶ 99.

On June 30, 2021, Doe called Jack McAdam to report Norfleet's assault. Id. ¶ 104. A couple of days later, she began seeing a therapist, id. ¶ 105, and a week later, on July 6, 2021, Jack McAdam told her that the company had not yet come to a resolution but would by July 9, 2021, id. ¶ 106. He offered for the company to pay for her therapy sessions. Id. ¶ 107. Also on July 6, 2021, Norfleet communicated through a coworker to ask Doe if she would speak with him, and she refused. Id. ¶ 108. On July 12, 2021, Jack McAdam informed Doe that Norfleet was no longer employed by McAdam Financial. Id. ¶ 109.

Doe continued to seek therapy as a result of her assault, but McAdam Financial did not follow through with its promise to pay for the costs of her therapy. Id. ¶¶ 111-12. After receiving notice that Doe had hired counsel, McAdam Financial accused Doe of certain licensing non-

compliance, which Doe claims was retaliation for her reporting Norfleet's conduct. Id. ¶ 113. The details of Doe's assault were known throughout the Boston office, and some employees were upset that Norfleet had been fired because he was a top sales manager who had helped many entry-level advisors gain clients. Id. ¶¶ 115-16. Doe believes that employees blamed her for his firing. Id. Under the circumstances, Doe resigned from McAdam Financial. Id. ¶ 117. She subsequently reported the rape by Norfleet to the Boston Police Department. Id. ¶ 118.

On January 6, 2022, Doe brought this action against McAdam Financial and Norfleet, asserting the following claims: against McAdam Financial, Title VII discrimination and retaliation, and negligence, negligent supervision, and negligent retention; against Norfleet, violation of the New York City Victims of Gender-Motivated Violence Protection Act (GMVA), violation of the Massachusetts Civil Rights Act (MCRA), and assault, battery, and intentional infliction of emotional distress; and against all Defendants, hostile work environment, sexual harassment, gender discrimination, and retaliation under the New York State Human Rights Law (NYSHRL) and the New York City Human Rights Law (NYCHRL). McAdam Financial and Norfleet both moved to dismiss, see ECF Nos. 16, 24, and Judge Woods referred the motions to me for a report and recommendation, see ECF No. 36.

## DISCUSSION

McAdam Financial and Norfleet separately move to dismiss for (1) lack of personal jurisdiction, (2) improper venue, and (3) failure to state a claim. Alternatively, both defendants move that the action be transferred to the District of Massachusetts.

I.      **Personal Jurisdiction**

A.      **Legal Standard**

On a 12(b)(2) motion to dismiss, the plaintiff bears the burden of establishing personal

jurisdiction over the defendant. See Penguin Grp. (USA) Inc. v. Am. Buddha, 609 F.3d 30, 34-35

(2d Cir. 2010). "Where, as here, the parties have not engaged in discovery, a plaintiff seeking to

defeat a motion to dismiss based on the lack of personal jurisdiction need only make a *prima*

*facie* showing that jurisdiction exists." GlaxoSmithKline LLC v. Laclede, Inc., No. 18-cv-4945

(JMF), 2019 WL 293329, at *3 (S.D.N.Y. Jan. 23, 2019). That requires "an averment of facts

that, if credited[,] would suffice" to establish that jurisdiction exists. In re Magnetic Audiotape

Antitrust Litig., 334 F.3d 204, 206 (2d Cir. 2003) (per curiam) (internal quotation marks

omitted).

The court "construe[s] the pleadings and affidavits in the light most favorable to

plaintiff[], resolving all doubts in [her] favor," Porina v. Marward Shipping Co., 521 F.3d 122,

126 (2d Cir. 2008), and must accept the allegations in the plaintiff's complaint "to the extent they

are uncontroverted" by defendant affidavits, "which the district court may also consider,"

GlaxoSmithKline LLC, 2019 WL 293329, at *3. "If the parties present conflicting affidavits, all

factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is

sufficient notwithstanding the contrary presentation by the moving party." Seetransport Wiking

Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala

Navala, 989 F.2d 572, 580 (2d Cir. 1993), as amended (May 25, 1993) (emphasis added). The

court will not, however, "draw argumentative inferences in the plaintiff's favor" or "accept as

true a legal conclusion couched as a factual allegation." In re Terrorist Attacks on Sept. 11, 2001,

714 F.3d 659, 673 (2d Cir. 2013) (citations omitted). "Thus, '[t]he plaintiff in opposing a

12(b)(2) motion cannot rely merely on conclusory statements or allegations . . . .'" NuMSP, LLC v. St. Etienne, 462 F. Supp. 3d 330, 341 (S.D.N.Y. 2020) (quoting Sullivan v. Jersey Strong Licensing LLC, No. 18-cv-7753 (RA), 2019 WL 3066492, at *2 (S.D.N.Y. July 12, 2019)) (alternation in NuMSP, LLC).

Personal jurisdiction is analyzed using a two-step inquiry. First, the court determines whether the exercise of personal jurisdiction is proper under the laws of the forum state (here, New York). See Sonera Holding B.V. v. Cukurova Holding A.S., 750 F.3d 221, 224 (2d Cir. 2014). If so, the Court then determines "whether the exercise of personal jurisdiction over the defendant comports with the Due Process Clause of the United States Constitution." Id.

### B.    New York's Long-Arm Jurisdictional Statute

Doe argues that both Defendants' contacts with New York are sufficient to confer personal jurisdiction under N.Y. CPLR § 302(a)(1).[1] N.Y. CPLR § 302(a)(1) permits a court to exercise personal jurisdiction over an out-of-state party if that party "transacts any business within the state," and if the claim arises from these business contacts. CutCo Indus., Inc. v. Naughton, 806 F.2d 361, 365 (2d Cir. 1986). "To meet the transacting business element under N.Y. C.P.L.R. § 302(a)(1), it must be shown that a party 'purposely availed [himself] of the privilege of conducting activities within New York and thereby invoked the benefits and protections of its laws . . . .'" D.H. Blair & Co. v. Gottdiener, 462 F.3d 95, 104 (2d Cir. 2006) (quoting Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 787 (2d Cir. 1999)) (alterations in Bank Brussels Lambert). "To determine whether a party has 'transacted business' in New York, courts must look at the totality of circumstances concerning the party's interactions with, and activities within, the state." Id. at 105 (citation omitted). "Although it is

---

[1] In her opposition to McAdam Financial's motion to dismiss, Doe "limits her argument to CPLR § 302(a)(1)." The Court's analysis is guided accordingly.

impossible to precisely fix those acts that constitute a transaction of business, [New York] precedents establish that it is the quality of the defendants' New York contacts that is the primary consideration." Fischbarg v. Doucet, 9 N.Y.3d 375, 380 (2007) (citations omitted).

As an initial matter, the parties dispute whether and when Doe actually lived in and worked from New York. Doe explains that she began working for McAdam Financial while living in New Hampshire, then moved to New York a year later after obtaining permission from Swenson, her direct supervisor (and approximately three weeks before she was assaulted by Norfleet in Boston). ECF No. 32 (Doe Decl.) ¶¶ 22, 30-32. According to Doe, Swenson, Norfleet, and Helmus all knew she was moving to New York and would continue to work remotely from there. Id. ¶ 34. She was among 20 to 30 entry-level employees who worked remotely from multiple states, including Connecticut, Rhode Island, Vermont, Maryland, Virginia, and Florida. Id. ¶ 23. Doe knew of at least three other McAdam Financial employees also working from New York, id. ¶ 41, text messages show that three company employees were aware of Doe's move to New York, id. Exs. 2-4, and Doe shared that she had moved with her coworkers, id. ¶ 38.

Defendants respond that Doe resided in New Hampshire. As rebuttal evidence, McAdam Financial offers a W-9 tax form and quarterly affirmations that Doe submitted to the company before and after the alleged assault. The two documents respectively state that her residence was New Hampshire and that she had not moved or changed her home address during the relevant quarter of 2021. See ECF No. 18 ¶ 15 & Exs. A, B. Also, Doe was required to have state-specific licensure to perform her work for McAdam Financial, and she never represented that she was licensed to perform services in New York; to the contrary, as part of her licensing and reporting requirements, she twice confirmed to McAdam Financial that she continued to live in New

Hampshire. <u>See</u> ECF No. 18 ¶¶ 12-15 & Ex. B. For his part, Norfleet says he was told Doe lived in New Hampshire and worked from there. ECF No. 25-1 ¶ 9. At this stage of litigation, I resolve this factual conflict in Doe's favor: even if she began working at McAdam Financial from New Hampshire, by June 2, 2021, she lived in New York, and she has resided here continuously since that date. Doe Decl. ¶ 46.

The remaining question is whether Doe's interactions with McAdam Financial and Norfleet are enough to find that the Defendants transacted business within New York. Doe alleges that she worked for McAdam and with Norfleet in New York as a remote employee, and her claims arise from her employment. She says that she participated remotely in weekly video meetings with her direct supervisor, new advisor meetings with Helmus, and regular meetings run by Norfleet about sales techniques and methods. <u>Id.</u> ¶¶ 26-27, 37. She communicated with other McAdam Financial employees via video, phone call, and text message on a daily basis. <u>Id.</u> ¶ 29, 37. After her assault, she experienced any hostile workplace culture or retaliation as an employee in New York. Compl. <u>See id.</u> ¶¶ 85-91, 113, 115-16. McAdam Financial argues that it does not transact any business in New York: it has no employees in New York, and a tiny amount of its revenue is sourced from New York-based clients. And even if McAdam Financial <i>did</i> transact business in New York, it argues that there is no relationship between any of Doe's asserted claims and such transactions. Norfleet similarly argues that he took no action in New York, including related to Doe's claims; he is a resident of Massachusetts, he worked from McAdam Financial's Boston office, and the rape occurred there as well.

"Where an out-of-state employer contemplates and creates an ongoing relationship with a New York employee to further its own business in the state, such proactive efforts may suffice as 'transacting business' within the purview of New York's long-arm statute." <u>Winner v. Tryko</u>

Partners, LLC, 333 F. Supp. 3d 250, 259 (W.D.N.Y. 2018) (citation omitted). Similarly, "[i]n some employment discrimination cases, personal jurisdiction has been established under Section 302(a)(1) over out-of-state defendants who supervise or communicate with an employee working remotely from New York." Kumar v. Opera Sols. OPCO, LLC, No. 20-cv-6824 (GHW), 2021 WL 4442832, at *8 (S.D.N.Y. Sept. 28, 2021).

For instance, where out-of-state managers and supervisors "knew" their employee plaintiff "worked from New York, permitted her to do so," "regularly communicated with her via email, phone, and virtual meeting for a sustained period of time" of multiple years, and "facilitated her remote work by sending her a company laptop and . . . issuing her a cell phone with a New York number," id., those managers and supervisors purposefully availed themselves of the privilege of conducting business in New York. See also Williams v. Preeminent Protective Servs., Inc., 81 F. Supp. 3d 265, 271-72 (E.D.N.Y. 2015) (finding out-of-state defendant corporation and manager subject to personal jurisdiction in New York where "[d]efendants hired [the plaintiff] knowing that she would live and work in Brooklyn, and 'continued their communications with plaintiff here' for a sustained period of time" (citation omitted)); Int'l Healthcare Exch., Inc. v. Glob. Healthcare Exch., LLC, 470 F. Supp. 2d 345, 358-59 (S.D.N.Y. 2007) (finding that out-of-state supervisor's repeated communications with New York-based employee via telephone and email were sufficient to satisfy Section 302(a)(1) where "a substantial portion" of the communications formed "the substantive basis" for the plaintiff's claims).

Doe has shown that, for at least part of her tenure at McAdam Financial, she lived in and worked from New York (even if certain paperwork states otherwise). But Doe has not

demonstrated that either McAdam Financial or Norfleet purposefully availed themselves of New York's laws.

There is no allegation in the complaint or evidence in the parties' affidavits that McAdam Financial hired Doe "knowing that she would live and work in [New York], and 'continued [its] communications with plaintiff here' for a sustained period of time, thereby engaging in the kind of 'independent activities' in the state that render long-arm jurisdiction appropriate." Williams, 81 F. Supp. 3d at 271 (quoting Fischbarg, 9 N.Y.3d at 382-83). Even if Doe's direct supervisor and other company employees knew that she was working from New York, the Court cannot conclude that any of those employees had authority to act on McAdam Financial's behalf sufficient to conclude that the *company itself* availed itself of business in New York through Doe's employment. Indeed, Doe's location is incidental to her work for the company; she may have worked from New York, but she did not perform any work for McAdam Financial that was directed at New York.

Similarly, Doe offers no details to support her claim that Norfleet purposefully availed himself of New York's law before the Massachusetts assault. Doe broadly asserts that she met with, called, and emailed Norfleet regularly, but neither her complaint nor affidavit describes the quality of her contacts with Norfleet *while she was in New York* for the three weeks before the assault. Norfleet's single attempted communication to Doe after the assault, the July 6, 2021 message delivered through a coworker, is similarly deficient. Doe has not borne her burden to demonstrate that Norfleet purposefully availed himself of New York's laws in the three weeks that she lived here before he raped her in Massachusetts, or in the single message he sent to her afterwards.

I find that the Court cannot exercise personal jurisdiction over McAdam Financial and Norfleet under Section 302(a)(1) of New York's long-arm statute.

### C.    Due Process Considerations

Even if Doe met New York's statutory requirements to establish personal jurisdiction, she would also need show that the exercise of personal jurisdiction comports with the Due Process Clause of the United States Constitution. The due process inquiry consists of two elements: the "minimum contacts" inquiry and the "reasonableness" inquiry. Chloé v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158, 164 (2d Cir. 2010). Jurisdiction may be either "specific" or "general." See Daimler AG v. Bauman, 571 U.S. 117, 127-28 (2014). The due process analysis "focuses on the relationship among the defendant, the forum, and the litigation," and specific jurisdiction "must arise out of contacts that the 'defendant *himself*' creates with the forum State"—"the plaintiff cannot be the only link between the defendant and the forum." Walden v. Fiore, 571 U.S. 277, 284, 286 (2014) (cleaned up) (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985)) (emphasis in Burger King).

To establish the minimum contacts necessary for specific jurisdiction, as Doe seeks here, she must show that her claims arise out of or relates to McAdam Financial's and Norfleet's contacts with New York, that they purposefully availed themselves of the privilege of doing business in New York, and that they could foresee being haled into court here. See Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 305 F.3d 120, 127 (2d Cir. 2002); Burger King, 471 U.S. at 472 (for specific jurisdiction, the court must determine that "the defendant has 'purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities").

For the same reasons as discussed above, Doe has not shown that either McAdam Financial or Norfleet conducted themselves in a way that was directed at New York, or purposefully availed themselves of the privilege of doing business in New York such that they could foresee being haled into court here. See Walden, 571 U.S. at 284 ("For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State."); see also In re SSA Bonds Antitrust Litig., 420 F. Supp. 3d 219, 235 (S.D.N.Y. 2019) (describing requirements to satisfy "purposeful availment" and "purposeful direction" tests for proving minimum contacts).

Because Doe has not established the minimum contacts necessary for specific jurisdiction, exercising personal jurisdiction over the Defendants would not comport with the Due Process Clause.

## II.     Transferring Venue

### A.     Legal Standard

Even when a court lacks personal jurisdiction over defendants, the court may exercise its discretion to transfer the case at hand to "any other district . . . where [the action] might have been brought" if the transfer is "[f]or the convenience of parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a); see also N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc., 599 F.3d 102, 112 (2d Cir. 2010); Tlapanco v. Elges, 207 F. Supp. 3d 324, 326 n.1 (S.D.N.Y. 2016) ("A district court may 'transfer venue even if it lacks personal jurisdiction over the defendants.'" (quoting Fort Knox Music Inc. v. Baptiste, 257 F.3d 108, 112 (2d Cir. 2001))). "28 U.S.C. § 1404(a) is 'a codification of the doctrine of *forum non conveniens* for the subset of cases in which the transferee forum is within the federal court system; in such cases, Congress has replaced the traditional remedy of outright dismissal with transfer.'" Nat'l Union Fire Ins. Co. of

Pittsburgh, Pa. v. Wynn Las Vegas, LLC, 509 F. Supp. 3d 38, 49 (S.D.N.Y. 2020) (quoting Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Texas, 571 U.S. 49, 60 (2013)). See also 15 Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. § 3854 (4th ed. 2022) ("[C]ourts have concluded that it conserves judicial resources, and furthers the interests of the parties, to transfer a case from a forum in which there is a difficult question of personal jurisdiction or venue to a district in which there are no such uncertainties.").

On a motion to transfer pursuant to § 1404(a), "a court must consider a two-part inquiry." Casey v. Odwalla, Inc., 338 F. Supp. 3d 284, 291 (S.D.N.Y. 2018). First, a court must "determine whether the action could have been brought in the proposed transferee forum." Id. at 292. Second, in a typical case that does not involve "a forum-selection clause, a district court considering a § 1404(a) motion . . . must evaluate both" private-interest and public-interest considerations to determine whether transfer is appropriate. Atl. Marine, 571 U.S. at 62-63. These factors include:

> (1) the plaintiff's choice of forum; (2) the convenience of the witnesses; (3) the location of relevant documents and relative ease of access to sources of proof; (4) the convenience of the parties; (5) the locus of operative facts; (6) the availability of process to compel the attendance of unwilling witnesses; (7) the relative means of the parties; (8) the forum's familiarity with the governing law; and (9) trial efficiency and the interests of justice.

Casey, 338 F. Supp. 3d at 292.

### B.   Analysis

#### 1.   Whether the Action Could Have Been Brought in the District of Massachusetts

An action could have been brought in the proposed forum "if the transferee district has personal jurisdiction over the defendants and the transferee district is an appropriate venue." Robertson v. Cartinhour, No. 10-cv-8442 (LTS)(HBP), 2011 WL 5175597, at *3 (S.D.N.Y. Oct.

28, 2011). Both McAdam Financial and Norfleet agree that the District of Massachusetts would be an appropriate venue. ECF No. 17 (McAdam Financial Br.) at 14; ECF No. 25 (Norfleet Br.) at 8.

### (a)   Personal Jurisdiction

The first question, as discussed above, is whether exercising personal jurisdiction over the Defendants is proper under Massachusetts law. Massachusetts's long-arm statute "imposes specific constraints on the exercise of personal jurisdiction that are not coextensive with the parameters of due process." SCVNGR, Inc. v. Punchh, Inc., 478 Mass. 324, 325 (2017); see also Cossart v. United Excel Corp., 804 F.3d 13, 18 (1st Cir. 2015).

Personal jurisdiction is plainly proper as to Norfleet, who declares under penalty of perjury that, at all relevant times described in Doe's complaint, he has been a resident of Massachusetts. ECF No. 25-1 ¶ 2. Massachusetts law permits the exercise of personal jurisdiction over anyone "domiciled in" the commonwealth. Mass. Gen. Laws ch. 223A § 2.

McAdam Financial requires a slightly longer analysis: the company is incorporated under Delaware law and has its principal place of business in Pennsylvania, rendering it an out-of-state entity for purposes of Massachusetts law. ECF No. 18 ¶ 3; see Mass. Gen. Laws ch. 223A § 2. A court can, however, exercise personal jurisdiction over any party that "transacts any business in [the] commonwealth" so long as the at-issue claim is one "arising from" these business contacts. Mass. Gen. Laws ch. 223A §3(a). "The test . . . is whether the defendant attempted to participate in the Commonwealth's economic life and whether the transacted business was a 'but for' cause of the harm." Access Now, Inc. v. Otter Prod., LLC, 280 F. Supp. 3d 287, 291 (D. Mass. 2017) (citing Cossart, 804 F.3d at 18).

A court can also exercise jurisdiction over a claim "arising from" an out-of-state party's causing a tortious injury in the commonwealth by either (1) "an act or omission in [the] commonwealth," or (2) an act or omission "outside" the commonwealth, so long as the party regularly does business, "engages in any other persistent conduct, or derives substantial revenue from . . . services rendered, in [the] commonwealth." Mass. Gen. Laws ch. 223A §3(d). Again, "[t]he 'arising from' clause in [the long-arm statute] is . . . generously construed in favor of asserting personal jurisdiction, by applying a 'but for' causation test." Workgroup Tech. Corp. v. MGM Grand Hotel, LLC, 246 F. Supp. 2d 102, 112 (D. Mass. 2003) (citation omitted).

I find that exercise of personal jurisdiction over McAdam Financial is proper under either § 3(a) or § 3(d) of Massachusetts's long-arm statute. But for McAdam Financial's conducting business in Massachusetts through its office located there, Doe would not have traveled to Boston to visit the company office and would not have participated in the company-sponsored outing that led to her rape and retaliation.

The second question is whether the exercise of personal jurisdiction over both Defendants comports with the Due Process Clause of the United States Constitution.

The inquiry is straightforward for Norfleet. Jurisdiction may be either "specific" or "general," see Daimler, 571 U.S. at 127-28, and general jurisdiction is appropriate as to an individual if they are domiciled in the forum state, id. at 137. Norfleet is a Massachusetts resident, so general jurisdiction is justified.

To establish the minimum contacts necessary for specific jurisdiction over McAdam Financial, Doe must show "that the exercise of personal jurisdiction satisfies the constitutional standards of 'relatedness, purposeful availment [ . . . ] and reasonableness.'"[2] Canadian Grp.

---

[2] The First Circuit's "reasonableness" inquiry considers five factors: "(1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining

Underwriters Ins. Co. v. M/V Arctic Trader, No. 96-cv-9242 (DAB), 1998 WL 730334, at *5

(S.D.N.Y. Oct. 19, 1998) (quoting Foster-Miller, Inc. v. Babcock & Wilcox Canada, 46 F.3d

138, 144 (1st Cir. 1995)). See also Bank Brussels Lambert, 305 F.3d at 127; Burger King, 471

U.S. at 472 (for specific jurisdiction, the court must determine that "the defendant has

'purposefully directed' his activities at residents of the forum, and the litigation results from

alleged injuries that 'arise out of or relate to' those activities").

Doe does not dispute that McAdam Financial has the minimum contacts with

Massachusetts necessary to justify exercising personal jurisdiction there. The company had a

Boston office which employed many of the people central to this case, including Doe, Swenson,

Norfleet, and the executives who communicated with Doe in the aftermath of the assault.

McAdam Financial plainly availed itself of Massachusetts law by having a physical location in

the state, employing workers there, and providing financial services there. See Adelson v.

Hananel, 510 F.3d 43, 50 (1st Cir. 2007) (holding that the "purposeful availment" requirement

"ensures that jurisdiction is not based on merely 'random, isolated or fortuitous' contacts with

the forum state" (citation omitted)). And finally, the work-sponsored event which led to Doe's

rape and retaliation took place in Massachusetts.

I find that the exercise of personal jurisdiction over Norfleet and McAdam Financial

comports with the Due Process Clause of the United States Constitution, and that the District of

Massachusetts would therefore have personal jurisdiction over both Defendants.

---

convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution
of the controversy, and (5) the common interests of all sovereigns in promoting substantive social
policies." Foster-Miller, Inc. v. Babcock & Wilcox Canada, 46 F.3d 138, 150 (1st Cir. 1995). Given these
factors' similarity to the private-interest and public-interest considerations that I examine in this venue-
transfer analysis, I do not address them separately.

**(b)      Venue**

"Where a plaintiff asserts multiple claims, 'venue must be proper as to each of the claims asserted, but a common factual basis between a claim where venue is proper and one where venue is improper may defeat dismissal of a claim for improper venue.' " Stone #1 v. Annucci, No. 20-cv-1326 (RA), 2021 WL 4463033, at *13 (S.D.N.Y. Sept. 28, 2021) (quoting Cartier v. Micha, Inc., No. 06-cv-4699 (DC), 2007 WL 1187188, at *2 (S.D.N.Y. Apr. 20, 2007)). Doe brings claims under Title VII and state, municipal, and common law.

Title VII has a specific venue provision, 42 U.S.C. § 2000e-5(f)(3). See Bolar v. Frank, 938 F.2d 377, 379 (2d Cir. 1991). A Title VII action may be brought:

> in any judicial district in the State in which the unlawful employment practice is alleged to have been committed, in the judicial district in which the employment records relevant to such practice are maintained and administered, or in the judicial district in which the aggrieved person would have worked but for the alleged unlawful employment practice . . . .

42 U.S.C. § 2000e-5(f)(3). The parties focus their attention on the first prong, as do I.

The events at the crux of this lawsuit took place in Boston, Massachusetts. McAdam Financial sponsored an outing at a Boston bar that led to Doe's rape by a company employee and subsequent retaliation by the company. See Doe #1 v. JetBlue Airways Corp. ("JetBlue I"), No. 19-cv-1542 (NGG)(CLP), 2020 WL 4605216, at *5 (E.D.N.Y. Aug. 11, 2020) (finding that venue would be proper for Title VII claim in Massachusetts in part because plaintiff reported an assault to a Massachusetts-based employee and ensuing investigation was conducted in Massachusetts); Doe # 1 v. JetBlue Airways Corp. ("JetBlue II"), No. 20-cv-11623 (ADB), 2021 WL 3375107, at *9 (D. Mass. Aug. 3, 2021) (finding venue appropriate in district where plaintiffs experienced "the assault[] which created the hostile work environment and led to the

gender and sex discrimination" alleged). Venue is therefore proper in Massachusetts as to Doe's Title VII claims.

None of Doe's state, municipal, and common law claims is governed by a particular venue provision, so the general federal venue statute, 28 U.S.C. § 1391, applies. Venue is proper in a district where a "substantial part of the events or omissions giving rise to this action" occurred. 28 U.S.C. § 1391(b)(2). "'Substantiality' for venue purposes is more a qualitative than a quantitative inquiry, determined by assessing the overall nature of the plaintiff's claims and the nature of the specific events or omissions in the forum, and not by simply adding up the number of contacts." Daniel v. Am. Bd. of Emergency Medicine, 428 F.3d 408, 432-33 (2d Cir. 2005); see also JLB LLC v. Egger, 462 F. Supp. 3d 68, 82 (D. Mass. 2020) ("When evaluating whether an action properly falls under § 1391(b)(2), the Court 'takes a "holistic view"' of acts giving rise to the claim." (citation omitted)); Pesmel N. Am., LLC v. Caraustar Indus., Inc., 754 F. Supp. 2d 168, 175 (D. Mass. 2010) (finding that "[t]he fact that substantial activities took place in other districts does not preclude a finding that venue is proper in Massachusetts."). As with Doe's Title VII claim, the events at the core of her state, municipal, and common law claims—the McAdam Financial-sponsored outing and rape by Norfleet—took place in Massachusetts.

Venue would be proper as to all of Doe's claims in the District of Massachusetts.

## 2.   **Evaluating the Transfer Factors**

Plaintiff's Choice of Forum. Generally, the "plaintiff's choice of forum should be accorded deference" if the "other factors do not weigh strongly in favor of transfer." ESPN, Inc. v. Quiksilver, Inc., 581 F. Supp. 2d 542, 547 (S.D.N.Y. 2008). Doe's chosen forum is also her home, and her decision to bring her case in this District is reasonable. This factor therefore leans against transfer.

The Parties' and Witnesses' Convenience. "The convenience of witnesses is typically the most important factor when considering a motion to transfer." Eres N.V. v. Citgo Asphalt Ref. Co., 605 F. Supp. 2d 473, 480 (S.D.N.Y. 2009). In weighing this factor, "the convenience of non-party witnesses is accorded more weight than that of party witnesses." Mastr Asset Backed Sec. Trust 2007-WMC1, ex rel. U.S. Bank Nat'l Ass'n v. WMC Mortgage LLC, 880 F. Supp. 2d 418, 422 (S.D.N.Y. 2012) (cleaned up). The Court "must consider the materiality, nature, and quality of each witness, not merely the number of witnesses in each district." AEC One Stop Grp., Inc. v. CD Listening Bar, Inc., 326 F. Supp. 2d 525, 529 (S.D.N.Y. 2004). It is true that Doe's therapist, a "key" witness in explaining the effect of the assault on Doe, works and lives in New York. But "the majority of conceivable witnesses in this case are located in . . . Boston," JetBlue I, 2020 WL 4605216, at *7, including Norfleet, Swenson, Doe's coworkers who witnessed Norfleet's behavior at the bar, other employees who can speak to McAdam Financial's culture and investigation of the assault, and (at least according to the Complaint) Doe's sister, whom she saw the day after the assault. See Compl. ¶¶ 79-80, ECF No. 39 (McAdam Decl.) ¶¶ 22-23. Trial in the District of Massachusetts would be more convenient for the majority of witnesses whose testimony is likely to be valuable in this case. This factor leans toward transfer.

Location of Relevant Documents. Doe claims, and Defendants do not dispute, that relevant employment documents are generated and kept in Pennsylvania. Regardless, this factor is mostly neutral in light of "the technological age in which we live, where there is widespread use of, among other things, electronic document production." Tlapanco, 207 F. Supp. 3d at 330-31 (quoting Rindfleisch v. Gentiva Health Sys., Inc., 752 F. Supp. 2d 246, 258 (E.D.N.Y. 2010)).

Locus of Operative Facts. "The locus of operative facts is a primary factor in determining whether to transfer venue." Steck v. Santander Consumer USA Holdings Inc., No. 14-cv-6942

(JPO), 2015 WL 3767445, at *6 (S.D.N.Y. June 17, 2015). Transfer is generally appropriate "[w]here a cause of action arises from claims of alleged wrongdoing in the proposed transferee district." Sheet Metal Workers' Nat'l Pension Fund v. Gallagher, 669 F. Supp. 88, 92-93 (S.D.N.Y.1987). "Transfer is not precluded where the operative facts have some connection to the initial forum," so long as "the transferee district has a stronger connection with the operative facts." Id. at 93. As discussed above, the events at the heart of this case took place in Massachusetts. This factor leans towards transfer.

Availability of Process To Compel Unwilling Witnesses. Federal Rule of Civil Procedure 45 generally prohibits the Court from issuing a subpoena that would compel a non-party witness to travel more than 100 miles. See EasyWeb Innovations, LLC v. Facebook, Inc., 888 F. Supp. 2d 342, 354 (E.D.N.Y. 2012). This Court would therefore be prevented from subpoenaing many of the non-party witnesses who live in Massachusetts, including people who saw key events on June 25, 2021, although I note that Defendants "have not provided any affidavits from those witnesses indicating that they would not voluntarily testify." Tlapanco, 207 F. Supp. 3d at 332. This factor leans toward transfer.

Relative Means of the Parties. This factor "may support or discourage transfer of venue if there is a significant financial disparity between the parties." Herbert Ltd. P'ship v. Elec. Arts Inc., 325 F. Supp. 2d 282, 290 (S.D.N.Y. 2004). If "proof of such disparity is not adequately provided, or does not exist, this is not a significant factor to be considered." Mazuma Holding Corp. v. Bethke, 1 F. Supp. 3d 6, 32 (E.D.N.Y. 2014). Doe may be correct that she lacks the means and resources of McAdam Financial, a corporation with offices in four states, but where a "plaintiff[ ] ha[s] not supplied the court with any documentation showing that transfer would be financially burdensome, this factor is neutral." Speedfit LLC v. Woodway USA, Inc., 53 F.

22

Supp. 3d 561, 578 (E.D.N.Y. 2014). Similarly, neither Doe nor Norfleet makes any attempt at showing that either party has more means than the other. This factor does not lean towards or against transfer.

The Forum's Familiarity with the Governing Law. Both this Court and the District of Massachusetts are familiar with Title VII claims. It is true that this Court has greater familiarity with New York laws like the NYSHRL, NYCHRL, and GMVA, but the District of Massachusetts will surely be in a better position to evaluate Doe's Massachusetts law claim. Therefore, this factor does not lean towards or against transfer.

Trial Efficiency and the Interests of Justice. Given the early posture of this case, the Court has not yet adjudicated any disputes that would "speed the resolution of future issues." Tlapanco, 207 F. Supp. 3d at 333. The interests of justice would be equally well served by litigating the case here or in Massachusetts.

In sum, the "two most important transfer factors—the convenience of the witnesses and the locus of operative facts—strongly support transferring this action" to the District of Massachusetts, as does the availability of process to compel unwilling witnesses. Id. The main factor weighing against transfer is Doe's decision to bring suit here, in her home forum. But again, the deference due to that choice can be overcome where, like here, other factors "weigh strongly in favor of transfer." ESPN, 581 F. Supp. 2d at 547. A transfer of venue is therefore warranted.

## CONCLUSION

The Court lacks personal jurisdiction over the Defendants or, at a minimum, personal jurisdiction is a difficult question. Because venue is proper in the District of Massachusetts and the interests of justice favor transferring this case to that District, I recommend that the Court

transfer the case to the District of Massachusetts. Should the Court disagree with this recommendation, I request that the Court remand the matter to me for consideration of Defendants' alternative Rule 12(b)(6) arguments.

DATED:     August 3, 2022
        New York, New York

SARAH NETBURN
United States Magistrate Judge

\*        \*        \*

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS
TO THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Gregory H. Woods at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Woods. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).